**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFRY PESEK, | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 20-cv-05788 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| LADDIE PESEK JR. AND | ) | |
| MARCELE PESEK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Jeffry Pesek ("Jeffry"), brings this action against Defendants, Laddie Pesek, Jr. ("JR")

and Marcelle Pesek ("Marcelle")(together, "Defendants"), alleging four claims against Defendants: (I)

breach of an express joint venture contract for a waste disposal business, (II) breach of fiduciary duty

based on an alleged violation of the joint venture contract, (III) an alternative claim for unjust

enrichment in the event the joint venture contract is found not to exist, and (IV) a claim seeking a

declaration that the parties had a joint venture contract. Defendants filed a Motion for Summary

Judgment ("Motion") on Counts II - IV, arguing that each count is either redundant of the breach of

contract claim (Count I), may not be sustained in light of Jeffry's judicial admissions, or barred by the

statute of limitations [227]. For the following reasons, the Court denies Defendants' Motion.

## I.    Background

The following facts are undisputed unless otherwise noted.

### A. Express Oral Contract

Jeffry asserts, in late 1997 or early 1998, Jeffry and JR held a meeting at their mother's house

in Cicero, Illinois, with Marcelle attending by phone. The purpose of the meeting was to follow-up

1

on discussions JR and Jeffry were having about starting a waste disposal business after JR expressed concerns about signing a non-competition agreement from his employer at the time, Allied Waste Industries ("Allied Waste"). In those prior conversations, Jeffry told JR he could fund a new business if JR and Marcelle (who formerly worked as a bookkeeper for Allied Waste) could run the day-to-day operations. Since JR would need to quit his job to run the new venture, and because JR just bought a house and car in Harrisonville, Missouri, the initial capital would need to include JR's salary and living expenses, which Jeffry was willing to include. After discussing these initial details, the parties agreed to meet in person to decide if they would proceed.

At the meeting in Cicero, Jeffry, JR, and Marcelle further discussed the steps to open their own garbage disposal business, the financial requirements of the business, the financial needs of JR and Marcelle, ownership, and the division of duties. According to Jeffry, they agreed to move ahead and form the business, Town and Country Disposal of Western Missouri, Inc. ("TCDW"). In his deposition, Jeffry states the parties entered into an express oral contract, at the meeting in Cicero, with the following terms:

1. They would start a waste disposal business based out of Harrisonville, Missouri;
2. Jeffry would provide the capital to start the business, which included funds to purchase their first truck and funds to pay the salaries for JR and Marcelle;
3. JR (with Marcelle's help) would run the day-to-day operations of the business from Harrisonville, Missouri;
4. Jeffry would provide management services from Cicero, Illinois;
5. Major decisions would be jointly made by both Jeffry and JR;
6. Jeffry and JR would be equal partners, after the potential grant of ownership interests to other people that they may jointly agree to bring into the business; and,
7. Although the economic interests of the business would be equally shared between Jeffry and JR, the shares of the business would be held in Marcelle's name so as to allow the business to possibly qualify as a Minority or Women- owned Business ("MWBE").

(Dkt. 1 at *¶13). Defendants deny entering into this contract.

### B. *Jeffry's Contributions and TCDW's Growth*

Marcelle incorporated the business in February of 1998, and in spring of that year, Jeffry provided JR with the initial capital for the business. A portion of the funds (between $22,000 and $27,000) were used to purchase the first truck in Iowa. The remainder of the funds were for business expenses, reimbursement of JR for the business license and legal expenses to start TCDW, and for JR's personal bills. Over the years, Jeffry estimates he invested in excess of $350,000 into the business and estimates that his total contributions exceed $500,000. Defendants admit Jeffry made these payments, but deny that these funds were investments of capital, as opposed to loans. In addition to these capital contributions, over the Course of TCDW's existence, Jeff provided management services for TCDW from Cicero, Illinois, including but not limited to advice and assistance on equipment purchases, review of business documents, news releases, and acting as the point of contact for the attorneys and other professionals based in Illinois that were retained by TCDW.

During TCDW's 17 years in business, equipment, vehicles, real estate and related businesses were either purchased with or funded out of TCDW assets that Jeffry initially funded. Ultimately, the reinvestment of TCDW funds allowed the business to grow from a one truck operation to a large business employing over 100 employees. As part of this expansion, TCDW started Town and Country Solid Waste Transfer station, Inc. ("TCWTS"), Town and country Recycling, Inc. ("TCR"), and Town and Country Organics, Inc. ("TCO").

### C. *TCDW's Sale and Dispute*

After achieving this success, the parties began discussing the possible sale of TCDW. In the first half of 2015, while at a waste management expo in Las Vegas, Jeffry and JR met with a representative of WCA Waste Corporation ("WCA") and discussed the potential sale of TCDW, TCWTS and TCR to WCA. After the initial meetings, Jeffry and JR discussed whether they should sell. JR felt strongly that the time was right and they should move ahead with negotiations, which

Jeffry agreed to. As a result of those negotiations, on September 30, 2015, WCA purchased the stock of TCDW and various other assets for $52,500,000.00. Certain assets owned or funded by TCDW were excluded from the sale to WCA and kept by the Defendants, including TCO, certain real estate, equipment, and vehicles.

The Defendants received $31,189,590.45 from the sale and later received another $2,000,000 from funds held in escrow. With the proceeds of that sale, Defendants purchased substantial assets, including Ozarks International Raceway and PF Racing.

Shortly after the sale, Jeffry began to contact JR about receiving his "share" of the proceeds and their next steps. On December 8, 2015, Jeff emailed JR inquiring about these issues. Jeffry stated "I know you have been busy closing out the company. When will you have time to talk about what monies I have coming to me from Town and Country our next move is?" JR testified that he knew he owed Jeffry money in 2015 and 2016, but stated Jeffry made no further demand "of how much he wanted or any part of it."

In 2017, the argument about what Jeffry was "owed," resurfaced when Jeffry sent an email on May 24, 2017, stating "I really would like to get what I have coming to me from the sale of the company." Soon after that, JR replied, asking whether Jeffry believed he was "entitled to a [percent] or an amount?" To which Jeffry responded on June 9, 2017, that "he was entitled to his 50%." That same day, JR responded that Jeffry's "initial investment" was not worth the same as JR's "life" working for the company, but that "[he] will bring something together for all to look at." Jeffry then responded "No, I was asking what you were thinking not how much you are going to give me. That was not the deal, and it is not up to you to decide how much I get. It is up to us to decide how much we both get." After he did not receive a response, on July 23, 2017, Jeffry wrote JR asking, "[c]an you work on the split this week please." JR responded on August 3, 2017, asserting, for the first time in their correspondence, that the amounts Jeffry provided for the business were a loan.

On October 29, 2017, JR followed up on his email stating, to the best of his and Marcelle's knowledge, Jeffry paid $350,000 into the business which, with interest, would entitle him to a payment of $687,058. Jeffry refused to accept this amount as satisfaction for what he was owed. Jeffry did not receive any amount from Defendants until August 19, 2019, when Marcelle initiated an unprompted payment of $275,000, that Marcelle and JR believed covered Jeffry's "loan" principal minus "things" defendants paid for. Jeffry again notified Defendants that this did not satisfy what Defendants owed him. Soon thereafter, Jeffry filed the present suit.

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted).

## III.    Discussion

In their Motion, Defendants argue they are entitled to summary judgment on Counts II - IV, arguing each of those Counts are either redundant of the breach of contract claim (Count I), may not be sustained in light of Jeffry's judicial admissions, or barred by the statute of limitations. The Court will address each of these arguments in turn.

The Court will first address Defendants' statute of limitations defense before turning to the merits of the parties' arguments. A cause of action for unjust enrichment is governed by Illinois's five-year statute of limitations. 735 ILCS 5/13–205. Defendants argue Jeffy's unjust enrichment claim is barred by the applicable five-year statute of limitations because his interrogatories admit that the last time he delivered money to the joint venture was in 2008. (Dkt. 227 at *5.) Thus, Defendants

5

argue, the five-year limitations period for Jeffry's claim expired in 2013, seven years before Jeffry filed suit. (*Id.* at *9.) In response, Jeffry asserts that his claim is subject to the "discovery rule," or rule stating that the limitations period begins to run when the plaintiff "knows or reasonably should have known of his injury and also knows or reasonably should have known that it was wrongfully caused." (Dkt. 229 at *9.) (citing *Knox College v. Celotex Corp., 430 N.E.2d 976*, 980 (Ill. 1981)). Accordingly, Jeffry argues, his limitations period began to run, at the earliest, from the date of the TCDW sale. (*Id.*) Jeffry concludes, because he commenced his lawsuit within five years of the TCDW sale, and a little over three years from when the Defendants first claimed his investment was just a loan, his claim is timely. (*Id.*)

The Court determines Jeffry's unjust enrichment claim is timely. The record definitively shows Jeffry became aware of the TCDW sale in 2015 and filed suit within five years of that date. Notwithstanding that earlier date, Jeffry's claims actually began to accrue in 2017 when the parties began to dispute the proceeds of the sale and when Jeffry learned, for the first time, that Defendants considered his contributions as a "loan." While Defendants seek to establish that the alleged breach occurred in 2008 when Jeffry last delivered money to TCDW, considering the facts in the light most favorable to Jeffy, he was not aware at that time that Defendants did not consider him a partner, and that Defendants planned to exclude him from receiving profits for a sale that would not occur for another seven years. Accordingly, the Court determines Defendants' statute of limitations defense fails.

The Court now turns to the merits of the parties' summary judgement arguments.

### A. Breach of Fiduciary Duty Claim (Count II)

Defendants argue they are entitled to summary judgment on Jeffry's fiduciary duty claim because it is redundant of Jeffry's breach of contract claim in Count I. (Dkt. 227 at *4.) In order to state a claim for breach of fiduciary duty, the complaint must allege that "a fiduciary duty exists, that

the fiduciary duty was breached, and that the breach proximately caused the injury of which the plaintiff complains." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 (7th Cir. 2015) (quoting *Neade v. Portes*, 193 Ill. 2d 433, 739 N.E.2d 496 (2000)). In certain instances, where a plaintiff's claims for breach of contract and breach of fiduciary duty are based on the same underlying facts and the same harm, the fiduciary duty claim can be dismissed. *See DeGeer v. Gillis*, 707 F.Supp.2d 784, 795 (N.D. Ill. 2010) (Bucklo, J.)

Defendants argue Jeffry's breach of fiduciary duty claim is subject to summary judgement because it is duplicative of the facts and harm alleged in his breach of contract claim. (Dkt. 227 at *5.) If Jeffry succeeds on Count I, Defendants argue, there are no additional or other damages to which he would be entitled beyond the contract damages sought in Count I. Defendants emphasize both Counts I and II allege the existence of an express contract, and seek identical relief, making them patently duplicative. (Dkt. 232 at *3.) Defendants conclude, because Jeffry's fiduciary duty count rises or falls with his breach of contract count, it is duplicative and summary judgment is appropriate. (Dkt. 227 at *5.) (citing *DeGeer*, 707 F. Supp. 2d at 795-76)).

In response, Jeffry argues Defendant's reliance on *DeGeer* is flawed for two reasons. First, while *DeGeer* found that a breach of fiduciary duty claims was duplicative of a breach of contract claim, many courts in this district have found the opposite. (Dkt. 229 at *3.) In *Gritters*, for example, Judge Chang explained this discrepancy, concluding that while "some courts in this district have characterized claims for breach of contract and claims for breach of fiduciary duty 'duplicative' of one another…the Illinois case-law (Illinois law governs on this issue of substantive law) upon which those cases rely dealt with a separate issue: whether claims for breaches of contract or fiduciary duty are duplicative of malpractice claims." *Gritters v. Ocwen Loan Servicing, LLC*, No. 14 C 00916, 2014 WL 7451682, at *9 (N.D. Ill. Dec. 31, 2014) (Chang J.). Jeffry emphasizes that other courts throughout the circuit have agreed with this analysis, often citing *Gritters* and distinguishing *DeGeer*, and declining

7

to dismiss arguably "duplicative claims, even when they were based on the same operative facts. For example, *LifeWorks Technology Group LLC v. First Delta Group, Inc* specifically states a plaintiff may simultaneously pursue breach of contract and breach of fiduciary duty claims because they are "comprised of different elements—the fiduciary-duty claim requires the existence of a fiduciary duty, while the contract claim does not. No. 18 C 2996, 2019 WL 4345362, at *7, n.6 (N.D. Ill. Sept. 12, 2019) (Lee, J.); *see also Russell Dean, Inc. 4 v. Maher*, 2018 WL 4679573, at *12 (N.D. Ill.) (Feinerman, J.) Relying on these authorities, Jeffry argues his fiduciary duty claim is not duplicative of his breach of contract claim because he did not bring it in the malpractice context.

Second, Jeffry asserts that the Court should reject the Defendants' argument that his fiduciary duty claim is duplicative of his breach of contract claim because he seeks punitive damages in his fiduciary duty claim that are not available in his breach of contract claim. (Dkt. 229 at *4.). Jeffry emphasizes that courts often hold that claims are not duplicative when punitive damages are available under one but not the other. *See, e.g.*, *Cardin v. NewRez LLC*, 637 F.Supp.3d 581, 593 (N.D. Ill. 2022)(Valderrama, J.). In response, Defendants take issue with Jeffry's primary assertion that, if a contract does in fact exist, Defendants automatically owe Jeffry any fiduciary duties (Dkt. 232 at *3.) (citing *LifeWorks*, 2019 WL 4345362 at *4 ("[p]arties to a contract do not owe fiduciary duties to each other merely by virtue of the contract.")

First, the Court determines, if a contract exists, Defendants have fiduciary duties to Jeffry. While it is true that parties to a contract do not automatically owe fiduciary duties to one another, *Prescott v. Allstate Life Ins. Co.*, 341 F.Supp.2d 1023, 1028 (N.D.Ill.2004) (Castillo, J.), the law is established and clear that "partners are fiduciaries to one another and each partner is bound to exercise the utmost good faith and honesty in all dealings and transactions relating to the partnership." *Hamilton v. Williams,* 214 Ill. App. 3d 230, 247, 573 N.E.2d 1276, 1288 (1991). Second, the Court determines that Jeffry's fiduciary duty claim is not duplicative of his breach of contract claim since it

8

is not brought in the malpractice context, which would be premised on fiduciary duties.  In line with *Gritters*, the Court is not persuaded that the relevant authority compels or even encourages the dismissal of a breach-of-fiduciary-duty claim as "duplicative" of a breach-of-contract claim, outside of the malpractice context.  Here, where Jeffry's contract and fiduciary duty claims are comprised of different elements, and where both claims are not dependent on fiduciary duties owed, the Court determines his claims are not duplicative.  Most importantly, because Jeffry seeks punitive damages in his fiduciary duty claim that are not legally available in his breach of contract claim, the Court will not foreclose Jeffry's possible recovery when the difference in damages available further proves Jeffry's claims are not duplicative.  *See Cardin*, F.Supp.3d 581 at 593.

Accordingly, the Court denies Defendants' Motion for Summary Judgment on Count II.

### B.  Unjust Enrichment Claim (Count III)

Defendants next argue they are entitled to summary judgment on Jeffry's unjust enrichment claim, pleaded "in the alternative," on two grounds.  First, they argue, Jeffry cannot recover for unjust enrichment because he has not alleged the existence of an implied contract, as opposed to an express contract.  (Dkt. 227 at *6).  Second, they argue,  Jeffry is only entitled to "money had and received," i.e., a return of the money Jeffry can prove he delivered to Defendants, not profits from those payments that would normally be allowed in an unjust enrichment claim.  (*Id.* at *5.)

While an unjust enrichment claim is unavailable when a contract already establishes rights and remedies, *see Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 819 (7th Cir. 2018), plaintiffs are allowed to plead contract theories and implied contract theories as alternatives to one another alternative.  *See Gociman v. Loyola University of Chicago*, 41 F.4th 873, 886 (7th Cir. 2022).  This means that a plaintiff may plead "(1) there is [a] contract, and the defendant is liable for breach of it; and (2)

9

if there is not [a] contract, then the defendant is liable for unjustly enriching himself at [the plaintiff's] expense." *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 325 (7th Cir. 2021).

Defendants argue that Jeffry cannot maintain an unjust enrichment claim for an implied contract because he repeatedly alleges the formation of an express oral contract. (Dkt. 227 at *5.) Defendant argues, if the jury finds that the express oral contract alleged in Count I was never formed, his judicial admissions that the parties entered into an express contract will bar him from asserting the existence of an implied contract with other terms. (*Id.*) Additionally, Defendants argue, if the trier of fact finds that there was no express contract, Jeffry is only entitled to assert an unjust enrichment claim for the amounts he delivered and no more. (*Id.*)

Jeffry, by contrast, argues that Defendants are incorrect that he needed to plead the existence of an implied contract to maintain his unjust enrichment claim in the alternative. (Dkt. 229 at *5.) On the contrary, he argues, parties often plead unjust enrichment as an alternative to a claim of express contract in the event that the former claim proves unsuccessful. (Dkt. 229 at *6-7.) Unless and until the Defendants stipulate to the existence and terms of the express contract, or the Court or a jury finds that such a contract exists, Jeffry argues he is entitled to pursue his contract and quasi-contract theories as alternatives of one another. (Dkt. 229 at *7.) Jeffry also argues that the authorities that Defendants rely on to argue that Jeffry's unjust enrichment claim is limited to the amount he contributed to the business, state the exact opposite conclusion. For example, *K-Stones, Inc. v. Ko*, 2025 IL App (2d) 230238, ¶64, states that an unjust enrichment claimant is actually entitled to seek and recover "the net profit attributable to the underlying wrong."

The Court determines that Jeffry does not need to plead an implied contract for his unjust enrichment claim to survive. It is well established that ("under the federal procedural rules, [a plaintiff] may allege ... [an] unjust enrichment ... claim[ ] in the alternative to its breach of contract claim even though it cannot recover under both breach of contract and quasi-contract theories." *Five-Star*

*AudioVisual, Inc. v, Unique Business Systems Corp.*, 769 F.Supp.3d 840, 862 (N.D. Ill. 2025) (Seeger, J.); *see* Fed. R. Civ. P. 8(d)(2). While Jeffry cannot recover for both his contract and quasi contract claims, he can maintain both claims as alternatives to one another. Additionally, the Court determines that Jeffry's unjust enrichment claim is not limited to the amount he provided to the business, but instead, if he is successful in his unjust enrichment claims, he can recover for the "net profit attributable to the underlying wrongdoing." *K-Stones,* App (2d) 230238 at ¶ 64. Since Jeffry's alternative claim is premised on allegations that Defendants' wrongdoings stem from violations of an implied partnership agreement, if he is successful, he is entitled to the net profit attributed to his investments in that partnership that he was not provided at the sale of TCDW.

Accordingly, the Court denies Defendants' Motion for Summary Judgment on Count III.

### C. Declaratory Judgement Claim (Count IV)

Finally, Defendants argue they are entitled to summary judgment on Count IV because Jeffry's declaratory judgment claim is duplicative of his breach of contract claim and would be fully resolved by adjudication of Count I at trial. (Dkt. 227 at *10.) Since any declaratory relief will be ultimately resolved by the Court, after a jury's determination of ultimate facts, the Court will not dispose of this claim prior to trial. The Court therefore denies Defendants' Motion for Summary Judgment on Count IV at this time.

### IV.     Conclusion

For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgement as to Counts II-IV [227]. All counts, including the breach of contract claim (Count I) Defendants did not move for summary judgment on, remain.


IT IS SO ORDERED.


11

Date: 3/30/2026

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

12